**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**CHRISTIE C. McCLURG,**

        **Plaintiff,**

**v.**                                      **Case No.  8:04-cv-2680-T-27TBM**

**HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,**

        **Defendant.**

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the court on referral by the Honorable James D. Whittemore for a Report and Recommendation on **Plaintiff's Corrected Motion for Summary Judgment and Supporting Memorandum of Law** (Doc. 35) and Defendant's response in opposition (Docs. 31, 39) and **Defendant, Hartford Life and Accident Insurance Company's, Dispositive Motion for Summary Judgment and Accompanying Statement of Undisputed Material Facts and Memorandum of Law** (Doc. 28), and the Plaintiff's response (Doc. 33).  By their cross-motions, the parties each seek summary judgment as to Plaintiff's Complaint (Doc. 1-1) for the recovery of benefits, enforcement of rights, and clarification of rights to future benefits under a plan governed by the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA" or "the Act"), 29 U.S.C. §§ 1001-1381.  Plaintiff filed her affidavit (Doc. 25), a statement of undisputed facts (Doc. 26), and exhibits in support of her motion (Doc. 35-2 through 35-8).  Hartford Life and

Insurance Company filed exhibits in support of its motion (Doc. 29).  A hearing on the motions was conducted on July 6, 2006.

I.

The undisputed facts establish that Plaintiff Christie McClurg (hereinafter "Plaintiff") was formerly married to Douglas McClurg (hereinafter "McClurg").  McClurg was a shareholder employee of the law firm of Hill, Ward & Henderson, P.A., (hereinafter "Hill Ward") and was a participant in Hill Ward's Group Benefit Plan (hereinafter "the Plan"),[1] administered and insured by Defendant Hartford Life (hereinafter "Defendant" or "Hartford").  Plaintiff is the beneficiary under her former husband's group life insurance benefit, policy number GL-703550,[2] including the Basic Life Insurance Benefit and the Accidental Death and Dismemberment Benefit (hereinafter "accidental death benefit").[3]

From November 8, 2002, to November 10, 2002, McClurg and several friends were at a hunting camp located at Ona, Florida.  At approximately noon on November 10, 2002, McClurg indicated that he was going to load his guns and equipment into his vehicle and

---

[1]The Plan and other documents from the claim file are filed repeatedly in the record. See (Doc. 29).  For simplicity's sake, the court will refer to those documents filed as exhibits to Plaintiff's corrected motion for summary judgment.  See (Doc. 35).

[2]In pleadings and in various parts of the record, the policy is also referred to as 703550(GL)1 or OGL 703550.

[3]According to the Certificate of Death, McClurg was married to Erika McClurg at the time of his death.  However, there appears no dispute that his former wife remained the primary beneficiary under the policy as agreed to in a marital settlement agreement confirmed by the state court.  See (Doc. 29-4 at 7, 28-29).

2

drive to his home in Tampa.  He left the cabin and went outside.  The other men heard a

gunshot, went outside, and found McClurg lying on his back on the ground near his vehicle.

He had sustained a serious injury to his left upper chest.  The rear passenger door on the

driver's side of the vehicle was open, and on the rear floorboard lay McClurg's .30-06 hunting

rifle partially placed inside a gun case with the muzzle end pointing outward.  The rifle's

safety was not on.  There were no eyewitnesses to the shooting.

McClurg's friends placed him in a vehicle and began transporting him to DeSoto

Memorial Hospital in Arcadia, Florida.  On the way to the hospital, McClurg stated, "I think

I'm going to die!" and stopped breathing.  A friend attempted CPR until they met up with a

DeSoto County EMS unit, which administered medical attention to McClurg the rest of the

way to the hospital.

Mr. McClurg was pronounced dead at DeSoto Memorial Hospital at 1:06 p.m. by Dr.

Mishkind, the emergency room physician.

Deputy Sheriff Matt Tinsley and Detective Jim Hall of the Hardee County Sheriff's

Office were notified of the shooting.  They went to the hospital, observed the decedent's body,

and spoke with Dr. Mishkind.  Later that afternoon, Deputy Tinsley and Detective Hall

interviewed the three men who had been with McClurg prior to his shooting.  According to

Deputy Tinsley in his report, one of them stated that McClurg had been drinking alcoholic

beverages earlier that morning but did not appear to be intoxicated.  See (Doc. 35-7 at 7).

By his death investigation report dated November 12, 2002, Det. Hall concluded that McClurg's rifle fired as he was attempting to place it into a gun case with the safety off. The Sheriff's Office ruled the death as an accidental death. See (Docs. 35-7).

The Hardee County Medical Examiner's Office performed an autopsy on November 11, 2002. The autopsy findings indicated the cause of death as a gunshot wound of the chest and abdomen and the manner of death as accidental.[4] See (Doc. 35-8 at 7). Toxicological testing by the Forensic Toxicology Laboratory at the Department of Pathology, Immunology, and Laboratory Medicine at the University of Florida in Gainesville, Florida, revealed that McClurg's blood alcohol level was 0.13 g/dL. See id. at 7. Based on the toxicology results, the Medical Examiner concluded that the decedent had consumed alcoholic beverages shortly prior to his death. See id. at 6.

Plaintiff thereafter made a claim to Hartford for the Basic Life Insurance Benefit ($750,000.00) under the subject life insurance policy. Plaintiff also made a claim for the Accidental Death Benefit under the policy ($750,000.00).

On January 14, 2003, Hartford approved Plaintiff's claim for the Basic Life Insurance Benefit and deposited the life insurance proceeds into an interest-bearing account in Plaintiff's name. By this letter, Hartford also informed Plaintiff that it was awaiting

_____

[4]Similarly, the Certificate of Death (Doc. 35-3), which was completed using the autopsy findings, indicated that the immediate cause of death was due to or as a consequence of a gunshot wound of the chest and abdomen. The certificate also indicated that the probable manner of death was an accident. Id.

4

additional information concerning McClurg's death and that her claim for accidental death benefits was pending review.

On February 12, 2003, Hartford denied Plaintiff's claim for accidental death benefits. Citing to pages 8 and 9 of the Hill Ward Certificate of Insurance, Hartford denied Plaintiff's claim because McClurg's death "was caused or contributed to by an injury specifically excluded from coverage," i.e., his intoxication.  Hartford advised that its decision was based on the policy language and all documents within the claim file, including the following information:  Proof of Death claim form, Florida Certificate of Death, Hardee County Sheriff's Office Incident report, the District Ten Medical Examiner's autopsy report, and the Forensic Toxicology Laboratory report.  According to Hartford, these documents revealed that the cause of McClurg's death was a gunshot wound of the chest and abdomen that occurred while he was loading the weapon into a soft gun case in his vehicle.  The rifle's safety was not on, and McClurg had a blood alcohol level of 0.13, over the legal limit in the state of Florida, where the accident occurred.  Based on this information, Hartford concluded that

> Mr. McClurg's judgement and ability to properly handle his rifle were affected by his intoxication.  Therefore, his death was caused or contributed to by an accident caused by his intoxication.  Since his death was caused or contributed to by an injury specifically excluded from coverage, no Group Accidental Death benefits are payable.

(Doc. 35-4 at 2).

Plaintiff appealed Hartford's denial of her claim.  On June 29, 2003, Hartford rejected Plaintiff's appeal and again denied Plaintiff's claim.  By this letter, Hartford stated:

[A] Loss must occur directly from an accident independent of all other causes in order to be covered under the policy. We do not interpret the word "accident" to include circumstances where it is reasonably foreseeable that death will occur.  The risk of serious bodily injury or death in the handling and use of firearms is a well-known fact.  It is our position that Mr. McClurg, having ingested a quantity of alcohol during the morning hours of 11/10/02 sufficient to result in his legal intoxication, should have reasonably foreseen that such action would result in severe injury or death, even if death was not intended.  The assumption of a known risk by the insured does not constitute an "accident" under the terms of the policy, and the result of that assumption -- death in this circumstance -- does not constitute a covered "injury" under the terms of the policy. We contend that it was reasonably foreseeable to Mr. McClurg that injury or death would occur if he handled firearms while intoxicated.  We further contend that a death is not accidental when it is a foreseeable result of an individual's voluntary act of becoming intoxicated.

In addition, even if the death could be considered a covered injury under the policy, which we find that it is not, the exclusion contained in the policy for injuries caused or contributed to by the injured person's intoxication would preclude recovery.  According to the autopsy report, Mr. McClurg had been consuming alcoholic beverages "shortly prior to" the discharge of his rifle during the morning hours of 11/10/02.  The sheriff's report indicated that it appeared Mr. McClurg's rifle fired as he was trying to place it in a gun case, noting that the rifle's safety was not on.  There is no indication in the sheriff's report or in the prior reports filed by two deputy sheriffs that any other factors or circumstances caused Mr. McClurg's rifle to discharge.  It is our position, therefore, that the policy exclusion for injuries caused or contributed to by the injured person's intoxication is also applicable.

(Doc. 35-6 at 2-3).  In short, Hartford determined that McClurg's death was not due to a

covered injury, but if it was, the policy exclusion for injuries caused or contributed by the

6

injured person's intoxication was applicable.  Id. at 3.  The letter further advised the Plaintiff

of her right to bring an action pursuant to section 502(a) of the Act.  Id.

 Plaintiff filed the instant action alleging that Hartford improperly and incorrectly

interpreted the operative language of the subject group life insurance policy and that its denial

of the accidental death benefit was arbitrary and capricious in violation of sections

502(a)(1)(B) and 502(c) of the ERISA, 29 U.S.C. § 1132(a)(1)(B) and 1132(c).  See (Doc. 2).

Plaintiff seeks judgment against the Defendant in the amount of $750,000.00, an award of

prejudgment interest at the prevailing statutory rate, and an award of attorney's fees and costs.

 The parties filed the instant cross-motions for summary judgment that are dispositive

of the case.


II.

 Section 502 of ERISA authorizes a beneficiary to recover benefits due to her under

the terms of an ERISA plan, enforce her rights under the terms of the plan, and or to clarify

her rights to future benefits under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B).  A

plaintiff suing under this provision bears the burden of proving her entitlement to contractual

benefits; however, if the insurer claims that a specific policy exclusion applies to deny the

insured benefits, the insurer generally must prove that the exclusion prevents coverage.

Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998) (citing Farley

v. Benefit Trust Life Ins. Co., 979 F.2d 653, 658 (8th Cir. 1992)).

 "[I]n an ERISA benefit denial case . . . the district court sits more as an appellate

tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the

7

reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Curran v. Kemper Nat'l Servs., Inc., No. 04-14097, 2005 WL 894840 at *7 (11th Cir. Mar. 16, 2005) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)). Nevertheless, the legal standard for entertaining summary judgment motions in cases involving a claim for benefits governed by ERISA is substantially the same as with other such motions: the court must view all evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party. See Burton v. Tampa Hous. Auth., 271 F.3d 1274, 1277 (11th Cir. 2001). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The Eleventh Circuit has establish a multi-step approach for the judicial review of virtually all ERISA-plan benefit denials using these standards: (1) Apply a *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong," i.e., the court disagrees with the administrator's decision. If the decision is not "wrong," then the court ends the inquiry and affirms the decision. (2) If the administrator's decision is *"de novo* wrong," then the court determines whether the administrator was vested with discretion in reviewing claims. If not, the court ends the inquiry and reverses the decision. (3) If the administrator's decision is *"de novo* wrong" and the administrator was vested with discretion in reviewing claims, then the court determines whether "reasonable" grounds supported the decision, i.e., the court reviews the decision under the more deferential arbitrary and

capricious standard.  (4) If no reasonable grounds exist, then the court ends the inquiry and reverses the administrator's decision.  If reasonable grounds exist, then the court determines if the administrator operated under a conflict of interest.  (5) If there is no conflict, then the court ends the inquiry and affirms the decision.  (6) If there is a conflict of interest, then the court applies the heightened arbitrary and capricious standard of review and either affirms or reverses the decision.  See Williams v. Bellsouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004) (following HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993-94 (11th Cir. 2001)).  At this step, the Eleventh Circuit has incorporated a two-step, burden shifting approach: (1) The claimant shows that the administrator of a discretion-vesting plan is conflicted.  (2) The burden then shifts to the administrator to prove that his plan interpretation was not tainted by self-interest.  Brown v. Blue Cross & Blue Shield of Ala., 898 F.2d 1556, 1566 (11th Cir. 1990).  A "wrong" but "reasonable" interpretation is arbitrary and capricious if it advances the conflicting interest of the administrator at the expense of the claimant.  See id. at 1566-67.  It is not arbitrary and capricious if the fiduciary justifies its interpretation on the ground of its benefit to the class of all participants and beneficiaries.  Id. at 1567.  This standard applies both to the interpretation of the policy language and factual determinations.  Torres v. Pttston Co., 346 F.3d 1324, 1332 (11th Cir. 2003).

Finally, as a threshold matter, the court must address the applicable standard of review in this case.  ERISA provides no standard for reviewing the decisions of plan administrators.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989); Williams, 373 F.3d at 1138.  In Firestone, the Court identified three standards of review each dependent

9

on the amount of discretion given the plan administrator under the applicable plan.  Here, it is

undisputed that Hartford, as plan insurer, was vested with discretion in interpreting the plan

and in reviewing claims.  See Plan at 12 (Doc. 29-2 at 13); see also (Doc. 28 at 7) (citing

Williams, 373 F.3d 1137-38); (Doc. 14).  As a result, the heightened arbitrary and capricious

standard applies to the court's review.  Brown, 898 F.2d at 1570.


III.

A.

        With respect to Hartford's interpretation of the pertinent accidental death benefit

provision and the intoxication exclusion, upon review of the administrative record and for the

reasons that follow, I conclude that Hartford's decision was correct.[5]

        In denying Plaintiff's claim and appeal, Hartford concluded that McClurg's death did

not qualify for accidental death benefits because the "loss" was not covered by the policy or it

---

        [5]When the court makes the initial determination regarding whether Defendant's
decision was wrong, it is a de novo review in the sense that the court reviews the denial of
Plaintiff's claim based on the administrative record without deference or any presumption of
correctness.  As such, the term, de novo, when used to refer to the court's initial review under
the heightened arbitrary and capricious standard, does not mean exactly the same thing as
when the term is used to describe one of the three ERISA standards of review.  See Parness v.
Metro. Life Ins. Co., 291 F. Supp. 2d 1347, 1357-58 (S.D. Fla. 2003).  When used to describe
one of the three ERISA standards of review, the term de novo denotes that the court is not
limited to reviewing the administrative record (and such review is done without deference or
any presumption of correctness).  See id.  However, when the court makes the initial
determination regarding whether Defendant's decision was wrong under the heightened
arbitrary and capricious standard of review, the court is limited to reviewing the
administrative record.  See Fick v. Metro. Life Ins. Co., 347 F. Supp. 2d 1271, 1280 (S.D. Fla.
2004) (citation omitted).

was specifically excluded from coverage.  <u>See</u> (Docs. 35-4 through 35-6).  In particular,

Hartford cited to the following language in the policy:

> **"What conditions are necessary for benefits to become payable?**
> We will pay a benefit if You suffer accidental injury while insured and:
> 1. a Loss results directly from such injury, and independent of all other causes; . . ."
>
> **"What types of injuries are excluded from coverage?**
> No benefit will be paid for a Loss caused or contributed to by:
> (9) the injured person's intoxication.
>
> Intoxication means that blood alcohol level content or the results of other means of testing blood alcohol level meet or exceed the legal presumption of intoxication under the law of the state where the accident took place.

(Doc. 35-2 at 9-10) (emphasis in the original); (Docs. 35-4, 35-6).  Relying on the autopsy and

forensic toxicology lab reports, which indicated that McClurg's blood alcohol level at his

death was 0.13 g/dL, a level above the legal limit in the state of Florida,[6] Hartford determined

McClurg's death was not accidental but instead a reasonably foreseeable consequence of his

handling a firearm while intoxicated and thus not a covered loss.  Even if it was, McClurg's

intoxication contributed to his death, and coverage was excluded.

     With respect to coverage, by its pleadings and at oral arguments, Hartford reiterates

the position it took in denying the accidental death claim and urges that under the federal

---

     [6]In support of this position, Hartford refers to section 316.1934(2)(c) of the Florida Statutes, which defines a blood alcohol level of 0.08 or higher as "prima facie evidence that the person was under the influence of alcoholic beverages to the extent that his or her normal faculties were impaired."  <u>Id.</u>  This subsection is found within the Florida Uniform Traffic Control Law, Fla. Stat. ch. 316, and concerns the operation of motor vehicles while under the influence of alcoholic beverages or controlled substances.

common law, its decision was correct in the first instance.  Relying on the First Circuit's

decision in  Wickman v. Northwestern National Life Insurance Co., 908 F.2d 1077 (1st Cir.

1990), and a number of drunk driving cases it found analogous to the instant case, it argues

that the definition of "accident" or "accidental injury" it employed in reviewing this claim is

generally accepted by the federal courts and approved of in this circuit.[7]  In any event,

Hartford notes that the Plaintiff has the burden of persuasion on the coverage dispute to

demonstrate that an accidental injury occurred and that the loss resulted directly from the

shooting "independent of all other causes" as required by the policy.  According to Hartford,

Plaintiff cannot do this under the circumstances of this case because McClurg's death was a

reasonably foreseeable consequence of his intoxication and his mishandling of a loaded

firearm.  By its view, common sense and reason require a conclusion that McClurg's

intoxication played a causal role in his death given the facts and circumstances of the shooting

that are known and the inferences properly drawn therefrom, namely, McClurg's poor

judgment and poor coordination in attempting to place a loaded rifle into its case with the

barrel pointed at his chest and the safety in the off position, the known or presumed effects of

alcohol intoxication on humans, and the absence of any other apparent cause for the shooting.

By this reasoning, Hartford maintains that its decision to deny coverage was correct.

---

[7]Hartford did not (and does not) dispute the conclusions reached by the Medical
Examiner or the Hardee County Sheriff's Office that McClurg's death was accidental nor does
it suggest that McClurg's death was a suicide or that foul play was involved.  However, it
maintains that as a matter of federal common law, the term "accident" or "accidental injury"
as used in this ERISA policy is defined to exclude the reasonably foreseeable consequences of
the insured's voluntary acts.

Plaintiff contends that the accident was a covered event regardless of the fact that McClurg had been drinking and that Hartford's denial of accidental death benefits was legally wrong, unreasonable, and arbitrary and capricious.  By her view of the circumstances, McClurg's shooting was accidental in the everyday sense of that term, and the covered 'loss," that is, McClurg's death, was the direct result of such accident, irrespective of the fact that he had been drinking.  According to McClurg's companions, he did not appear impaired despite his drinking, and Plaintiff argues that there is no evidence that McClurg's alcohol consumption was a cause of McClurg's death.

Plaintiff argues that Florida law informs the correct decision in this case and that Hartford's reliance on the doctrine of foreseeability, a concept from tort law, to define the terms, "accident" or "accidental injury," was legally improper and results in a definition contrary to the ordinary meaning of such terms.  It also urges that it would be fundamentally unfair to allow Hartford, in its claims review, to employ a definition that the parties did not bargain for in the policy and that narrows the scope of coverage in a manner adverse to the insured.  Plaintiff argues that consistent with Florida law and at least one goal of ERISA - to protect the interests of employees and their beneficiaries - Hartford was required to ascribe the ordinary and usual meanings to the terms but failed to do so.

Plaintiff cites to State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So. 2d 1072, 1076 (Fla. 1996), and Prudential Property and Cas. Ins. Co. v. Swindal,  622 So. 2d 467 (Fla. 1993), for the proposition that tort law principles do not control judicial construction of insurance contracts in Florida, and therefore, Hartford's reliance of the doctrine of foreseeability to define the term "accident" was wrong as a matter of law.  Indeed, in Swindal,

13

the court stated, "Florida law has long followed the general rule that tort law principles do not control judicial construction of insurance contracts.  Insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties."  Id. at 470.  In Plaintiff's view, these principles direct that an "accident" or "accidental injury" is properly construed in accordance with the dictionary definition as an event that is unexpected and undesirable, especially when it results in damage or harm.

Alternatively, Plaintiff argues that if the terms are deemed to be ambiguous, the ambiguity must be construed against the insurer.  Under Florida law, where policy language is subject to differing interpretations, the term "should be construed liberally in favor of the insured and strictly against the insurer," and where an insurer fails to define a term, "the insurer cannot take a position that there should be a 'narrow, restrictive interpretation of the coverage provided.'"  State Farm Fire & Cas. Co., 720 So. 2d at 1076.[8]  Where the term, "accident," is not defined, because the term is susceptible to varying interpretations, it should be construed in favor of the insured and to encompasses not only "accidental events, but also injuries or damage neither expected nor intended from the standpoint of the insured."  Id.  Thus, Plaintiff contends that under this Florida case law, the court must construe any ambiguity in the terms in Plaintiff's favor and find that McClurg's death, as an unintended and unexpected occurrence, was "accidental" as a matter of law and to read into the contract any

---

[8]Plaintiff also cites federal law.  See Lee v. Blue Cross/Blue Shield of Ala., 10 F.3d 1547, 1551 (11th Cir. 1994) ("Under the doctrine of contra preferentem, the court should construe the ambiguity in these terms against the drafter in favor of the insured rather than allowing the insurer to insist upon a narrow, restrictive interpretation.") .

added language concerning "reasonable foreseeability" and "assumption of risk" in favor of the insurer/drafter would be entirely improper.

In response to Plaintiff's citation to Florida law, Hartford urges that the federal common law set forth in Wickman, Cozzie v. Metro. Life Ins. Co., 140 F.3d 1104 (7th Cir. 1998), and several drunk driving cases, governs this case.  Under this law, the traditional approaches taken by the states for resolving whether an occurrence or injury was an "accident" have been supplanted by an objective standard, which defines "accident" according to the reasonable expectations of the person who placed himself in a perilous situation. Defendant argues that the Eleventh Circuit, in Buce v. Allianz Life Ins. Co., 247 F.3d 1133 (11th Cir. 2001), approved the Wickman approach, and thus, the court must employ this objective analysis in defining the term "accidental injury" in this policy.[9]

The Eleventh Circuit has held that ERISA preempts state law and authorizes the federal courts to develop a body of federal common law to govern issues in ERISA actions not covered by the act itself.  Branch v. G. Bernd Co., 955 F.2d 1574, 1580 (11th Cir. 1992), cited in Buce, 247 F.3d at 1140; Dixon v. Life Ins. Co. of N. Am., 389 F.3d 1179, 1183 (11th Cir. 2004); Horton, 141 F.3d at 1041.  In crafting a body of common law, the federal courts may look to state law for guidance as long as they adhere to the policy concerns that inform ERISA because of the states' greater experience in interpreting insurance contracts and resolving coverage disputes.  Horton, 141 F.3d at 1041; Glass v. United of Omaha Life Ins. Co., 33 F.3d 1341, 1347 (11th Cir. 1994).  However, in deciding whether a particular rule should become a

---

[9]In her response, Plaintiff cites to several cases critical of the Wickman standard and its application in given cases.  See (Doc. 33-1 at 4-7).  Given the apparent acceptance of Wickman in Buce, this argument is unpersuasive.

part of the federal common law, the court must consider whether the rule, if adopted, would further ERISA's goals. "ERISA has two central goals: (1) protection of the interests of employees and their beneficiaries in employee benefit plans, and (2) uniformity in the administration of employee benefit plans." Horton, 141 F.3d at 1041 (citations omitted).[10]

Because I find the federal common law has supplanted traditional approaches employed by the states for determining when an event or injury is an "accident," federal common law rather than the decisions of the Florida courts governs the coverage dispute in this case. As set forth below, while I believe that Florida law helps to inform the decision, upon the application of the federal common law and consideration of the known facts and circumstances of this case, I conclude that McClurg did not suffer an "accidental injury" as required for accidental death benefits under the subject policy.

In Wickman, the court expressly sought to fashion a federal common law rule for determining when an event or injury was an "accident" under insurance plans regulated by ERISA. In that case, the insured was covered under an accidental *means* policy that defined

---

[10]In many respects, the basic rules of contract construction under the federal common law mirrors Florida law. When interpreting plan provisions such as these, federal law requires the courts to interpret the contract language "in an ordinary and popular sense as would a person of average intelligence and experience, such that the language is given its generally accepted meaning if there is one." Keszenheimer v. Reliance Standard Life Ins. Co., 402 F.3d 504, 507 (5th Cir. 2005). Similar to state law, federal law dictates that the court first assess the natural or plain meaning of the policy language, striving to give meaning to every provision. Dahl-Eimers v. Mut. of Omaha Life Ins. Co., 986 F.2d 1379, 1382 (11th Cir. 1993) (citing Landress Auto Wrecking Co. v. U.S. Fid. & Guar. Co., 696 F.2d 1290, 1292 (11th Cir. 1983)). Where there is ambiguity, the court should construe the ambiguity against the insurer rather than allow the insurer to insist upon a narrow, restrictive interpretation. Lee, 10 F.3d at 1551. However, as discussed herein, the general rules of contract construction had helped only slightly in deciding when an event or injury was "accidental," thus prompting the court in Wickman to seek to create a unifying approach applicable to ERISA regulated benefit plans.

"accident" as "an unexpected, external, violent, and sudden event" and the parties disputed only whether the event giving rise to Wickman's death was "unexpected."  See Wickman, 908 F. 2d at 1084-85.  The district court upheld the decision of the insurer and denied accidental death benefits upon a finding that, even if the event was not a suicide, Wickman knew or should have known that serious bodily injury or death was a probable consequence of his volitional act and his death was not "accidental."[11]

In affirming this decision, the First Circuit looked first to the terms of the policy, but finding no definitive answer as to whether this event was "unexpected," it next surveyed the two approaches taken by state courts for resolving whether an injury was "unexpected" and thus "accidental.[12]  Seeking to steer clear of the morass in which it found the state courts struggling to resolve such issues, the court resolved to announce a different standard.  By its approach, if a plain reading of the terms of the policy did not dictate the proper result, the court looks to the reasonable expectations of the insured in determining whether an event or injury was "accidental."  Where the insured did not expect an injury similar in type or kind to that suffered, the inquiry looked next to the reasonableness of the underlying suppositions to the expectations.  On this inquiry, if the underlying suppositions were unreasonable, then the

---

[11]In Wickman, the insured had left his car in a break-down lane near a bridge and was observed standing on the outside of a bridge's guardrail, holding the railing only with his right hand.  He then fell off the bridge to railroad tracks below and later died from his injuries.  Id. at 1079-80. Wickman was insured under an ERISA plan.  The insurer paid basic benefits but denied the beneficiary's claim for accidental death benefits.

[12]By the first approach, state courts looked to whether the policy insured against accidental *means* or accidental *results*, with the distinction ostensibly dictating the appropriate result.  By the second and recently more favored approach, the courts declined to employ such terms or to draw such distinctions as a means of determining whether an injury or death was unexpected and thus an "accident."

injuries are deemed not accidental.  Where the evidence of the insured's expectations is

insufficient to allow for a determination of the subjective expectations of the insured, an

objective analysis is employed.  By this analysis, the fact-finder asks "whether a reasonable

person, with the background and characteristics similar to the insured, would have viewed the

injury as highly likely to occur as a result of the insured's intentional conduct."  Id. at 1088.

Applying this approach, the First Circuit affirmed the decision that Wickman's death was not

an accident when his expectations were viewed either subjectively or objectively.[13]

At least one panel in the Eleventh Circuit has approved of the Wickman approach.  In

Buce, the Eleventh Circuit approved of Wickman, noting in dicta:

> [W]e think that to deploy the federal common law of ERISA to give
> some unity to the concept of 'accident' is sound judicial policy. . . .
> [T]he First Circuit was on eminently sound ground in ruling out
> 'accidental means' and focusing instead on the objectively
> reasonable expectations of a person in the perilous situation that the
> decedent had placed himself in.

Buce, 247 F.3d at 1146.

Here, the subject policy defines neither the term, "accident," nor the term,

"accidental injury."  While Florida contract law would suggest a definition of the terms

favorable to the insured, the applicable federal common law as established by Wickman leads

to an affirmation of Hartford's interpretation of the accidental death benefit.  Applying the

---

[13]The Seventh Circuit adopted the Wickman approach in Cozzie.  There, the insurer of
an ERISA plan determined that accidental death benefits were not payable because the
decedent's death was not caused by an "accident" and the loss was otherwise excluded.
Specifically, the court affirmed the insurer's decision to define "accident" in terms of
reasonable foreseeability.  Under this objective standard, the policy excluded coverage in the
circumstances where the decedent died from injuries suffered in a single car accident and the
evidence revealed he was driving with a blood alcohol level of .252.  As the decision notes, a
number of other courts have reached a similar conclusion in drunk driving cases.

Wickman standard, what little that can be gleaned from the circumstances suggests McClurg

had no expectation of shooting or killing himself when he began to pack up his gear and stow

his rifle in its case.[14]   Whether the suppositions underlying his expectations at the time of the

shooting were reasonable, however, is far more problematic given his characteristics, level of

intoxication, and the manner in which he handled his rifle.   Here, the record reveals nothing of

McClurg's subjective thoughts or actual expectations as he attempted to stow his loaded rifle

into its soft case with the gun barrel pointed at his chest and the safety in the "off" position.

Under Wickman, the inquiry is an objective one, that is, whether a reasonable person, with

background and similar characteristics of McClurg, would have viewed the injury as highly

likely to occur as a result of his intentional conduct.

By an objective analysis, McClurg, an accomplished professional and intelligent

man, was surely aware of the danger inherent in mixing alcohol and guns and in particular,

mishandling a loaded rifle while intoxicated.   Regardless of the views of his colleagues, he

was intoxicated as that term is defined in the policy.   Although the parties cite to the Florida

statutes addressing driving under the influence of alcohol, the state has an express provision

governing the use of a firearm while under the influence of alcohol.   Florida Statute section

790.157 provides:

> (1) It is unlawful and punishable as provided in § 790.151 for any
> person who is under the influence of alcoholic beverages or controlled

---

[14]McClurg's friend reported that just prior to his death, he was engaged in a
conversation about politics, and while he had been drinking, he did not appear impaired.
Nothing that his friends describe or as later revealed by the police investigation would indicate
that he had any subjective expectation that he would shoot himself while placing his weapon
into is case.

substances, when affected to the extent that his or her normal faculties are impaired, to use a firearm in this state.

(2) Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while using a firearm while under the influence of alcoholic beverages or controlled substances, when affected to the extent that his or her normal faculties were impaired or to the extent that the person was deprived of full possession of his or her normal faculties, the results of any test administered in accordance with § 790.153 or § 790.155 and this section shall be admissible into evidence when otherwise admissible, and the amount of alcohol in the person's blood at the time alleged, as shown by chemical analysis of the person's blood or chemical or physical analysis of the person's breath, shall give rise to the following presumptions:

(c) If there was at that time 0.10 percent or more by weight of alcohol in the person's blood, that fact shall be prima facie evidence that the person was under the influence of alcoholic beverages to the extent that his or her normal faculties were impaired.

Fla. Stat. § 790.157(1), (2).  In this subsection, to "use a firearm" means "to discharge a firearm or to have a firearm readily accessible for immediate discharge," and "readily accessible for immediate discharge" means "loaded and in a person's hand."  Id. at § 790.151(1), (2).

By the provisions of this Florida statute, McClurg's blood alcohol level is prima facie evidence of and raises a rebuttable presumption that he was under the influence of alcoholic beverages to the extent that his normal faculties were impaired.  Under an objective analysis, regardless of whether McClurg was aware the rifle had a shell in its chamber or that the safety was off, the manner in which he attempted to put away his rifle suggests that his intoxication impaired his judgment, if not his coordination as well.  A reasonable person of McClurg's experience and intelligence would recognize the clear danger to himself and possibly others in

20

these circumstances and know better than to handle the rifle in that fashion.  Given the lack of other explanations for the shooting, the presumption that alcohol left McClurg impaired and contributed to his shooting is not rebutted by his colleague's statement to the police that McClurg did not appear intoxicated prior to the shooting.

Florida law informs the decision in another manner.  Under Florida law, a firearm, like an automobile, is considered a dangerous instrumentality that involves a high degree of risk of serious injury or death, such that a person who handles a firearm is expected to exercise the "highest degree of care" to avoid injury to another.  See Kitchen v. K-Mart Corp., 697 So. 2d 1200, 1206 (Fla. 1997).  The reasonable person, recognizing such inherent danger, would be expected to exercise that same high degree of care to protect himself as well.  In analogous circumstances involving drunk driving accidents and injuries, federal courts have consistently determined that death resulting from driving while intoxicated is not an "accident" because the combination of intoxication and driving an automobile make the result reasonably foreseeable.[15]  Here, the reasonable person would have understood the dangerous circumstances created by using a firearm while intoxicated in a manner highly likely to cause

_____

[15]Baker v. Provident Life & Acc. Ins. Co., 171 F.3d 939 (4th Cir. 1999); Cates v. Metro. Life Ins. Co., No. 96-6600, 1998 WL 385897 (6th Cir. June 30, 1998); Cozzie v. Metro. Life Ins. Co.,140 F.3d 1104 (7th Cir. 1998); Stout v. Hartford Life & Acc. Ins. Co., No. 05-1177, 2006 WL 2331149 (C.D. Ill. Aug. 10, 2006); Carter v. Sun Life Assur. Co., Civil Action No. 05-2214, 2006 WL 1328821 (E.D. La. May 11, 2006); Moore v. Metro. Life Ins. Co., No. 04-73935, 2006 WL 286973 (E.D. Mich. Feb. 6, 2006); Eckelberry v. ReliaStar Life Ins. Co., 402 F. Supp. 2d 704 (S.D. W.Va. 2005); Harrell v. Metro. Life Ins. Co., 401 F. Supp. 2d 802 (E.D. Mich. 2005); Weatherall v. Reliastar Life Ins. Co., 398 F. Supp. 2d 918 (W.D. Wis. 2005); Poeppel v. Hartford Life Ins. Co., 273 F. Supp. 2d 714 (D.S.C. 2003); Schultz v. Metro. Life Ins. Co., 994 F. Supp. 1419 (M.D. Fla. 1997).

death or serious injury if the gun discharged.  Under the objective standard, the shooting in these circumstances was not "accidental."

In summary, while these conclusions work an unfortunately harsh result, I find that the objective standard set forth in <u>Wickman</u> and approved in <u>Buce</u> calls for a conclusion in this case that McClurg's shooting was the consequence of his volitional acts in drinking until intoxicated and using his loaded rifle in a most foreseeably dangerous fashion, and in accordance with the federal common law of ERISA, it was not "accidental."  Hartford's conclusion in this regard was correct and I recommend that the court affirm the decision.

B.

Upon a finding that McClurg's death was not a loss covered by the policy, it is unnecessary for the court to determine whether the intoxication exclusion applies to exclude coverage.  <u>See</u> <u>Buce</u>, 247 F. 3d at 1149 n.7.  However, because Hartford relied on the exclusion as an alternative reason for denying coverage, and in the event that the court finds that McClurg's death is a covered loss, I recommend a finding that Hartford interpreted and applied the exclusion correctly.

Hartford argues that the benefit is expressly excluded under the policy because McClurg's intoxication "caused or contributed to" his death.  Plaintiff maintains that there is no proof that McClurg's intoxication caused his death.  Hartford bears the burden of proving the applicability of this exclusion.  <u>See</u> <u>Horton</u>, 141 F.3d at 1040 (citing <u>Farley</u>, 979 F.2d at 658); <u>see also</u> <u>Hastie v. J.C. Penney Life Ins. Co.</u>, 115 F.3d 895, 896 (11th Cir. 1997) (following Florida law and determining that the insurer had the burden of showing some

causal connection between the intoxication and the insured's death in order for the exclusion to be effective).

I find that the factual conclusions reached above dictate the conclusion here that McClurg's loss was excluded by the intoxication exception even if his death was a covered loss. As discussed above, the circumstances of McClurg's shooting and the lack of other explanations, coupled with the unrebutted statutory presumption of his impairment while using a loaded firearm in a highly dangerous manner, reveal that his intoxication substantially contributed to his death even if it was not the direct cause. Hartford's decision to deny accidental death benefits for McClurg's death under this exclusion was also correct. I recommend that the court affirm Hartford's decision concerning the applicability of this exclusion as well.[16]

---

[16]Upon the conclusion that Hartford's decision was correct, it is unnecessary for the court to consider whether the administrator's decision was reasonable, whether the administrator operated under a conflict of interest, and whether the plan interpretation was tainted by self-interest. However, the circumstances clearly reveal that even if Hartford's conclusions in the first instance were wrong, they were not arbitrary and capricious. As discussed above, Hartford's decision to deny accidental death benefits was reasonable, and although Hartford, as both the administrator and insurer of the plan, operated under a conflict of interest, the decision is not tainted by self-interest as it ultimately inures to the benefit of all participants and beneficiaries.

In Cozzie, the Seventh Circuit noted that the purpose of accidental death benefits is to provide the insured's families with additional benefits and assistance in dealing with an unexpected death. "However, as with all insurance arrangements, the plan fiduciary or administrator must ensure that payments are reserved for those who truly fall within the terms of the policy. . . . and [w]e cannot say therefore, that [the administrator's] determination that the purposes of the plan are best served by acknowledging a qualitative difference between the ingestion of a huge quantity of alcohol and other tragedies of human life which do not involve such a significant assumption of a known risk by the insured is incompatible with the goals of the plan." Cozzie, 140 F.3d at 1110. Likewise, although Hartford stands to benefit from every denial of benefits, in these circumstances, it has served the goals of the plan by preserving the assets of the fund for "accidental" deaths that do not result from the voluntary assumptions of known risks by the insured and its decision should be affirmed.

IV.

For the foregoing reasons, it is RECOMMENDED that the court GRANT Defendant, Hartford Life and Accident Insurance Company's, Dispositive Motion for Summary Judgment and Accompanying Statement of Undisputed Material Facts and Memorandum of Law (Doc. 28) and DENY Plaintiff's Corrected Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 35).  It is further recommended that the court direct the Clerk to enter judgment in favor of the Defendant, with each side bearing their own fees and costs, and terminate all pending motions and close the case.

Respectfully submitted on this
31st day of August 2006.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE


**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; see also Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.


Copies to:
The Honorable James D. Whittemore, United States District Judge
Counsel of Record